HARRIMAN NATIONAL BANK v. L. O. SCOTT, et al.

Eastern Section. February 23, 1929.

Petition for Certiorari denied by Supreme Court, May 25, 1929.

James A. Monroe, of Harriman, for appellant.

H. M. Carr, of Harriman and Anderson & Word, of Knoxville, for defendant.

SNODGRASS, J. This suit is to collect a note for $3500 due the complainant, and the contest here is now over the order of liability. The note on its face is the primary liability of the Hamilton & Carr Coal Co., W. B. Hamilton, Horace M. Carr and L. O. Scott. W. B. Hamilton and Horace M. Carr composed the coal company, a partnership. While Horace M. Carr, under the idea of his liability, signed the note sued on, as a consolidation of certain previous smaller notes executed by Hamilton and Scott, and afterwards renewed the same, he did so under the representations of the other defendants that the notes represented advancements on coal purchased from the coal company. In other words, that Hamilton borrowed the money for the coal company to enable him to meet its payrolls and to get out the coal they were selling to Scott and others, and, believing this to be the truth and that the small notes had been executed for the company's benefit, he was induced to sign the $3500 note, and under the same idea to renew it; but on discovering the falsity of these representations he declined further to renew it, and this suit is the result of such declination. Carr sought relief by a cross-bill, which upon grounds of fraud attacked the validity of the note and sought to be relieved therefrom.

Proof was taken and the cause heard before the Chancellor, who upon a written finding of facts was of opinion that they were all liable to the bank, but that the order of liability should be (1st.) Hamilton, (2nd) Scott, and (3rd) Carr, and made his decree accordingly, to-wit:

## "FIRST."

"That prior to March 25, 1924, and during the years 1922 and 1923 the defendants W. B. Hamilton as principal and L. O. Scott as his security, had borrowed and received from complainant various sums of money aggregating $3500 and had executed to complainant five different notes for said amount; and that on March 25, 1924, the Hamilton Carr Coal Company (a firm or partnership composed of W. B. Hamilton and Horace M. Carr) along with defendants, W. B. Hamilton and Horace M. Carr as principals and L. O. Scott as endorser, made, executed and delivered to complainant their joint and several promissory notes for the sum of $3500 which complainant received and accepted on March 27, 1924, and in consideration thereof, cancelled and surrendered to someone of the defendants the various smaller notes aforesaid aggregating that amount, said original note of March 25, 1924, for $3,500 having been executed by defendants to take the place of the five small notes aforesaid; that the note sued upon, dated August 23, 1925, was a renewal of said original note and of the original indebtedness aforesaid; and that complainant is therefore entitled to a judgment against all the defendants in the order of their liability as hereinafter fixed and decreed, for the full amount of said note, including six per cent interest thereon from its maturity to the date of this decree, and to an additional ten per cent of said principal and interest as attorney fees for its solicitor of record herein, as hereinafter shown.

"It is so ordered, adjudged and decreed.

## "SECOND."

"That the amount of said loan, originally represented by the five small notes of the defendants, W. B. Hamilton and L. O. Scott, as heretofore stated, was the individual and personal indebtedness and obligation of said defendants, Hamilton and Scott, due from them to the complainant, and that defendant and cross-complainant Horace M. Carr was not liable for any part of said original indebtedness, either as an individual or as a member of the firm of partnership of the Hamilton Carr Coal Company, and that said original loans were made to defendants, Hamilton and Scott, on their own faith and credit, and same was not made upon the faith or credit of either the said Horace M. Carr or the firm or partnership of the Hamilton Carr Coal Company.

"It is so ordered, adjudged and decreed.

"The court is further of the opinion that defendant, Horace M. Carr, was induced to sign the original note of $2500 on March 25, 1924, by and through false and fraudulent representations made to him by the defendants W. B. Hamilton concerning said original five notes for that amount, and that he was likewise induced to sign the renewals thereof by similar false and fraudulent representations made to him by said Hamilton and Scott concerning said original loans, and that for those reasons the said Hamilton and Scott should be held liable to complainant for the amount of the face of the notes sued upon, including interest and attorney fees thereon, in advance of the defendant and cross-complainant, Horace M. Carr.

"It is so ordered, adjudged and decreed.

### "THIRD."

"The court is further of the opinion that complainant, Harriman National Bank, had no knowledge at all of the false and fraudulent representations thus made by said defendants Hamilton and Scott to the defendant Horace M. Carr, concerning said indebtedness, or with reference to the note for $3500, thus executed to it by the parties aforesaid on March 25, 1924, or of any of the renewals of the same; on the contrary, the court is of opinion that complainant was and is an innocent holder and purchaser of the original note thus executed to it by all of the defendants aforesaid dated March 25, 1924, as also of all renewals thereof, including the note sued upon in this cause; that complainant accepted said notes in good faith, and without any knowledge of any kind of the matters complained of in the answer of the defendant Carr, to the original bill, or in his cross-bill herein, having cancelled and surrendered to defendants, Hamilton and Scott, said original five notes aggregating said sum of $3500 and that complainant is therefore a holder of all of said notes in due course, for full value and without notice of any fraud having been practiced upon the said Horace M. Carr by either of his co-defendants; and is therefore entitled to a decree against the said Horace M. Carr along with a decree against the other defendants aforesaid for the full amount of the face of the said note, together with interest due on the same, and to an additional sum of ten per cent of said principal and interest as attorneys fees for its solicitors herein, and that the defendant W. B. Hamilton shall be first liable on said judgment, the defendant, L. O. Scott shall be second and next liable thereon, and the defendant Horace M. Carr shall be third and last liable for the amount of said judgment.

"It is so ordered, adjudged and decreed.

## "FOURTH."

"It is thereupon accordingly ordered, adjudged and decreed that complainant, Harriman National Bank, a national banking corporation duly organized under the laws of the United States of America, and doing business in Harriman, Tennessee, have and recover of the defendants, W. B. Hamilton, L. O. Scott and Horace M. Carr said sum of $3500 being the face of the note sued upon herein dated August 23, 1925, together with the further sum of $402.50 interest on the same from maturity of said note on October 22, 1925, to the date of this decree on October, 1927, making the sum of $3,902.50 principal and interest, together with the further sum of $390.25 attorneys fees thereon, as provided in said note, and sued upon in the original bill herein, same being ten per cent of the amount of said principal and interest, thus aggregating the total sum of four thousand two hundred and ninety-two dollars and seventy-five cents ($4,292.75) together with all the costs of this cause, and for which amount judgment is hereby given the complainant, Harriman National Bank and is hereby rendered against the defendants aforesaid in the order of their liability as hereinbefore decreed, the said W. B. Hamilton being first liable thereon; the defendant L. O. Scott being next and second liable for the payment of the full amount of said judgment and cost, and the defendant Horace M. Carr being next and third liable for the payment thereof.

"It is accordingly so ordered, adjudged and decreed. . . ."

In addition to the written opinion there was a further finding of fact set out in the decree, as follows:

"1.   That the five small notes set out and described in the record executed to complainant bank, which went to make up the note for $3500 for which the note sued on in this cause is renewal, were executed to complainant, by the defendant W. B. Hamilton as principal and defendant L. O. Scott as surety and the proceeds were credited to the individual account of W. B. Hamilton in said bank, or went into his hands.

"2.   That said loans covered by said five small notes were made solely on the credit of said Hamilton and Scott.

"3.   That the Hamilton Carr Coal Company, under which name the defendants Hamilton and Carr were doing business at the time said notes were executed, was not a party to said loans, and that said loans were not made on the credit of said company or for its use and benefit. but were the individual debts of W. B. Hamilton and L. O. Scott.

"4. That said Carr did not authorize the execution of said notes for the benefit of himself nor the Hamilton Carr Coal Company.

"6. That said Carr was induced to sign the first thirty-five hundred dollar note, for which the note sued on, is a renewal, by it being represented to him that said five small notes were executed to the complainant bank by the Hamilton Carr Coal Company, and for its use and benefit that said bank desired to include them all in one note, and believing that he was already liable on said notes, as a member of the firm of said company, he signed the first thirty-five hundred note.

"7. That said Hamilton in representing to said Carr that said five small notes were the notes of the Hamilton Carr Coal Company, misrepresented the facts, which amounted to a fraud upon said Carr, and that his signature was secured to said first thirty-five hundred dollar note, through fraudulent representations.

"8. That as soon as said Carr learned that said five notes were not the obligation of the Hamilton Carr Coal Company he refused to further renew or pay said thirty-five hundred dollar note.

"9. That when said Carr refused to further renew said note, both W. B. Hamilton and L. O. Scott came to him, and represented that while these small notes were made by said Hamilton, they were given to enable him to meet the payrolls of the Hamilton Carr Coal Company, and the proceeds were used for that purpose, and were made as advances on coal which said Scott purchased from said company to be paid for as he received returns on his sales of the said coal with the understanding that said notes were to be taken up, out of the checks issued by said Scott, as his accounts became due, and that said Carr believing these statements consented to and did further renew said thirty-five hundred dollar note.

"10. That the representations thus made, inducing said Carr to further renew said note was a misstatement of the facts, and amounted to a fraud upon him. That the said Scott purchased his last car of coal from the Hamilton Carr Coal Company on January tenth, 1923, amounting to $152.50, and was paid for on March 21, 1923. That he had paid for all coal purchased prior thereto before January 1, 1923, that four of these notes amounting to $2800 were executed after said Scott ceased to purchase coal from said company, and that three of said notes, amounting to $2250 were executed long after said Scott had fully settled and closed his account with said company. The court therefore finds that said Carr was

induced to again renew said $3500 note by false and fraudulent representations.

"11. That the $750 note, one of the small notes referred to, was executed on September 6, 1922, when the Hamilton Carr Coal Company was making money and paying large. dividends and there was no apparent needs for obtaining loans for it.

"12. That at the time these small notes were being executed said Hamilton and Scott occupied offices in the same building. That said Scott was not interested in the Hamilton Carr Coal Company, but Carr was, yet he (Carr), was not requested to sign said small notes, and knew nothing about the matter until he was requested to sign the first thirty-five hundred dollar note.

"13. That the Hamilton Coal Company, had a bank account in the same bank where these said five notes were discounted and that the proceeds of these notes do not seem to have been placed to the credit of said company, but in the first instance were placed to the individual credit of said Hamilton, or received by him personally.

"14. That these loans covered by the five small notes were not obtained to meet payrolls of the Hamilton Carr Coal Company, in making developments at the mines because the bulk of the development work referred to seems to have been done many months before the bulk of these loans were obtained. Pay days seem to have been on the first and fifteenth of each month. The dates of these notes do not· correspond with the dates of the payrolls; neither do the amount of the notes correspond with the amounts of the payrolls.

"15. That the books kept by W. B. Hamilton of the transactions of the Hamilton Carr Coal Company when shown to Mr. Carr did not reflect the true facts with reference to its business dealings and in this manner Mr. Carr was misled as to the true facts concerning the company's business.

"That a great deal of money received by said Hamilton for the sale of company coal was not placed to the credit of the company in the bank, in fact no record at all was kept of the sales of coal delivered by the wagon, which sales amounted to several hundred tons. That these facts were not known or revealed to said Carr at the time he was induced to execute the first thirty-five hundred dollar note, or at the time he was induced to renew same, and could not have been ascertained by an inspection of said books.

"16. That the complainant bank did not know of the circumstances inducing said Carr to sign the first note of thirty-five hundred dollars, nor the facts and circumstances inducing him to renew said note, after he declined to further renew same,

therefore it was an innocent holder, and is entitled to a decree against all of the defendants, but under the facts the court holds that the defendant Carr under his cross-bill is entitled to the relief therein sought to the extent of having the decree provide that W. B. Hamilton be held first liable, L. O. Scott second liable, and H. M. Carr third liable, both as an individual and as a partner in the Hamilton Carr Coal Company, all of which is ordered, adjudged and decreed by the court.

"17. That during the time the Hamilton Carr Coal Company was operating in 1922 and 1923, the defendant W. B. Hamilton was operating a sawmill on his individual account, cutting lumber from timber taken off of the lands covered by the lease of the Hamilton Carr Coal Company, and that his individual bank account kept with complainant bank during this time.

"On the trial of this case, the defendant L. O. Scott moved the court for permission to amend his answer to the cross-bill of H. M. Carr, as follows:

"The defendant and cross-complainant H. M. Carr either knew all of the facts relied upon in his cross-bill, or had full and ample opportunity to know said facts, as alleged by him in the years 1922, '23 and '24, and with the knowledge of all the facts and circumstances before him or with full opportunity to know said facts and circumstances, he failed and neglected for an unreasonable length of time to take steps to protect his rights if any he had, but, upon the other hand, stood quietly by until the books, records and papers of the Hamilton Carr Coal Company the partnership of which he was a member, had either been lost or mislaid and could not be found, and until the defendant Scott was deprived of all opportunity to ascertain and present to the court all of the facts and circumstances with reference to the expenditures of said company, and other material facts and circumstances. The said Carr is guilty of gross laches and delay in asserting that he is not primarily liable upon the note sued on by the complainant, and he has failed and neglected to take steps in due season to have the court declare that he is not liable upon said note according to its tenor. The unreasonable delay upon the part of the said H. M. Carr has made it impossible for the defendant L. O. Scott to ascertain all of the facts connected with the partnership known as the Hamilton Carr Coal Company. The defendant therefore pleads and relies upon these facts as a complete bar and estoppel against the relief sought by the said cross-complainant H. M. Carr."

All parties have acquiesced in the disposition of the case except the defendant L. O. Scott, who excepted to the decree and to the find-

ing of fact as set forth therein insofar as the decree changes the order of liability as shown by the note sued on, and insofar as it was not adjudged that H. M. Carr is not primarily liable thereon and the defendant L. O. Scott is liable only as endorser thereon; and he prayed and perfected an appeal to this court and has made two assignments of error, as follows:

"I"

"The Chancellor was in error in decreeing that L. O. Scott was liable for the payment of this indebtedness ahead of the defendant H. M. Carr and in reversing the order of liability as evidenced by the said note. The Chancellor should have held that the parties on said note were liable in the following order, to-wit: W. B. Hamilton and H. M. Carr as principals, and L. O. Scott as endorser or surety. The decree in this respect was erroneous because the greater weight of evidence shows that the said Carr and Hamilton were primarily liable and the said L. O. Scott secondarily liable only. . . ."

"II."

"The Chancellor erred in reversing the order of liability and in decreeing that L. O. Scott was liable ahead of H. M. Carr for the payment of this indebtedness to the bank, because the undisputed evidence shows that H. M. Carr was estopped by negligence, laches and delay, to assert a liability on said note contrary to its tenor. The Chancellor should have held that H. M. Carr was liable primarily on said indebtedness, and that he was estopped to assert a different character of liability, and he should have held that L. O. Scott was liable only as surety or endorser for the said H. M. Carr and W. B. Hamilton."

We agree with the Chancellor in his findings and disposition of the case. We think defendant Scott has failed to take in the full significance and effect of the Chancellor's finding of fact, which is, in effect, that the notes for which the consolidated note was executed, was not a debt of the partnership, and that not only was the defendant Carr induced to assume them by the fraudulent representations of Hamilton, connived in and aided by those of Scott, but that, in effect, there was a conspiracy upon the part of Hamilton and Scott to bring Carr into the liability and place him ahead of Scott in its order. It is true both Hamilton and Scott say that the money was borrowed for the use and benefit of the coal company, but the record does not bear out this contention. It is rather against such contention.

Originally the mining company was a corporation, owned by defendant Carr and one Staples, which leased some lands belonging to the Harriman Land Company near Emory Gap. This corporation

in 1920 leased the mine and its equipment (which Carr says cost several thousand dollars) to defendant Hamilton for one year, for the consideration of seventy-five per cent of the net proceeds, and the defendant Scott (who was a coal dealer), personally guaranteed the performance of the contract on the part of Hamilton. Carr's testimony was to the effect that, notwithstanding costly improvements were made out of the profits of the mine under such lease, in practically rebuilding the incline, extending tramways to the railroad and a tipple built thereon, that there was paid to him as profits under said lease $1853, and that the lease was a profitable one for both parties. It appears also that prior to May, 1922, under a foreclosure of the mine and its equipment, he (Carr) had become sole owner of the property at the price of $1700; that he had arranged with the bank to carry $850 of the purchase price, giving a new mortgage to secure it, but that before that time he had invested some six or eight thousand dollars in addition to the profits used in betterments; that after he became the owner defendant Hamilton came to him and proposed to go into partnership and operate the mine; that he (Carr) told him he had put all the money into the mine he could afford, and that Hamilton said he would finance it; that thereupon on May 20, 1922 they agreed to open up the mine and, as he owned the property and Hamilton had no investment in it, that he (Carr) should have seventy-five per cent of the profits and Hamilton twenty-five per cent, and that thereupon he made the following entry upon his books at the time: "Accounts between H. M. Carr and W. B. Hamilton, 1922, May 20. They have agreed to open up Emory Gap mine, and operate it, Carr to have three-fourths profits and Hamilton one-fourth, Carr to assume and account for the cost of a new pump, pipe, etc., purchased from the James Supply Company and to own it. All other expenses to come out before profits are to be divided."

It is not necessary here to state the provisions of these two contracts in detail, which in addition defined and regulated the application of profits. But on November 27, 1922, the defendant Hamilton bought a one-half interest in the mine at the price of $1500, $150 of which was to be paid in cash, $500 in cash on December 10, 1922, and his note for $850 to be paid six months after date. This note was to be put up with a note for a like amount owed by Carr to the First National Bank of Harriman, which as stated was secured by a deed of trust on the mine. Carr was to make a deed to a one-half interest at any time desired and the mine was to be run on a fifty-fifty basis.

It is proper to state that during all this time the defendant Scott was a coal broker, friendly with Hamilton and having his office in the same building with him, and as stated he had personally guar-

anteed for Hamilton the performance of the first year contract of lease. From his testimony and exhibits thereto we are satisfied that he knew as much, if not more, as to the coal handled by the partnership than the defendant Carr knew, because not only did the books kept by Hamilton (who was running the mine) fail to show the status of the business to Carr, but because Scott was buying coal from both the company and Hamilton individually (it appearing that Hamilton was also a coal broker during the time on his own account) and from his books Scott knew just how much coal he was buying from the company and how much from Scott individually, and, of course, was charged with all the implications of this knowledge.

Mr. Scott somewhat soft-pedaled his testimony as to his dealings with Hamilton as an individual coal broker, but the exhibit which he files containing the record at least of part of these dealings, speaks with more certainty. It may be true that Hamilton, dealt with the coal company's affairs in his own name, but not, we think, so as to deceive Scott. Hamilton had, during the interval before the purchase of an interest on November 7, 1922, issued checks signed by him as an individual to care for profits. It appears that on August 12, 1922, and September 5, 1922 he issued checks for $250 and $655.55 respectively, but the other profit checks filed August 21, 1922, September 20, 1922, October 2, 1922, October 9, 1922, and November, 1922 were signed Hamilton & Carr Coal Company, with W. B. Hamilton written under the printed signature. One of these checks, however, that of August 21, 1922, had the printed signature of Emory Gap Coal Mining Company on it.

On dealing with a partnership one must take notice of the peril· of a limited responsibility, if his contract seems to be only with an individual, though that individual may be one of the members composing a partnership. Primarily the contract would have to be in the name of the partnership to bind the partnership, and therefore those notes which were taken up by the consolidation note had not until that time become the primary obligation of the partnership; and we are constrained to believe as did the Chancellor that the obligation of the company was manufactured out of the necessities of the case, notwithstanding the company received no benefit and should not have been under any necessity of borrowing money in 1923 at the time the smaller notes were executed, nor in September, 1922 when one of them, the $750 note was executed. We think the proof shows that all expenses, including the sinking of the slope to the entry, were paid out of the profits accruing up to the time of the purchase of a half interest by Hamilton in November, 1922, or that there were profits to have so paid them, and that there remained on hand certain of these profits at the time which, with those ac-

cruing, should have been sufficient with which to prosecute the slope to any sub levels. Hamilton's own account of how he has dealt with the records of his transactions, or failing to keep proper records of them so as to render an account in detail of the matters that had been entrusted to him discredit any representations that he might make as to matters in which he is uncorroborated. He in one breath almost confesses that he kept no record of wagon sales to Emory Gap and Harriman people, and then states that he had a record, a small order book which he kept in his pocket. He in fact appears to have kept no books from which the true status of the business was disclosed or is now made to appear. He appears to have had very little available capital and purchased his half interest on credit. He ran a sawmill and lumber business at the same time, in which he confessed to have lost money. We are convinced that whatever representations he may have made to Scott to induce him to sign his personal notes as security, that these notes were executed and the money used for his own personal benefit. Had these notes been executed in the name of the company upon his representations that they were to obtain temporary loans with which to pay company accounts for payrolls or other necessary expenses, it would have brought the matter within the apparent scope of his authority, in which an accommodation endorser would have been protected no matter how false the representations or however the money may have been applied; but on the face of the transaction it was the primary obligation of Hamilton, in which he alone engaged, and did not purport to bind the partnership; and the statement at the time that the money was to be used for his benefit would not bind the company, unless upon sufficient proof that that was the recognized method of company transactions, or that the partnership actually received the benefit, neither of which is proven in this case.

As stated it is true that while operating the mines under a quasi renewal of the original lease two of the checks in payment of the $1865.67 of profits paid over to Carr were signed only by W. B. Hamilton, but the other five checks carrying the remainder were signed, one in August, 1922 with the printed signature of the Emory Gap Coal Company, and the other four by the printed signature of the Hamilton & Carr Coal Company, with the name "W. B. Hamilton" signed underneath. The Hamilton & Carr Coal Company was the name of the partnership, but in no event under the proof can it be regarded that W. B. Hamilton was the name of the company.

As early as September, 1922 the partnership had opened an account with the Harriman National Bank under the firm name and style of the Hamilton & Carr Coal Company, and it was therefore known by that name in 1923, and the most of these small notes were executed by W. B. Hamilton, with L. O. Scott as his endorser. The

Chancellor we think has authorizedly credited Carr's testimony as to how the consolidated note for these small notes came to be executed and more than once renewed before Carr came to be convinced that a fraud had been practiced upon him. We think the proof shows that these notes were the individual debts of W. B. Hamilton, who seems to have had other needs for capital than a mining need. He was in the sawmill business as indicated, which is notoriously perilous, and in which he confessed to have lost money. He was also in the coal brokerage business on his own account, from which it is made to appear from Scott's testimony that he sold coal to Scott, if not also to others. Scott is somewhat hazy in reply to questions as to times and amounts of such coal purchased by him from Hamilton, though his record filed shows that, beginning with October 4, 1922, he purchased two cars of coal, not from the Hamilton & Carr Coal Company, but especially distinguished in red ink as bought from Hamilton, at the price of $371.94, which together with previous balances due Hamilton & Carr Coal Company on that date amounted to $1637.75. Then on October 26, 1922 he seems to have purchased four more cars from Hamilton & Carr Coal Company at the price of $641.70, which seem to have been exactly paid for in a check for that amount dated November 20, 1922, notwithstanding it is made to do balancing work with other totals brought forward from the previous purchases. Thus, while he knew he was dealing with different parties, he mingled their accounts to arrive at final totals and to balance. These four cars so purchased in October were the last in 1922 gotten from Hamilton & Carr Coal Company, and only one more is shown in this account to have been purchased from said company, which was in January, 1923.

. Another observation about this account is, that it was not closed, but showed a large balance due Hamilton, in which was included $152.50 as due the Hamilton & Carr Coal Company up until September 4, 1923, when another item was included therein. of $98.40 for a car of coal purchased from Hamilton. This September 1923 sum, with other items, amounted to $1424.03 and, as so due, was balanced by the following entries:

"Payments by check March 31, 1923,                    $650.00
"By accounts receivable for coal sold Hamilton,       $344.50
"By cash,                                             $429.53".

The last of these two entries are undated, but it is manifest they were not entered in order as to time.

It is this account or exhibit that throws discredit upon Scott's testimony. It appears he knew he was dealing with different parties, and just what he was getting from the partnership and what he was getting from Hamilton individually, and, so far as the record filed is concerned, properly designated the cars secured from each,

and it appears from this that during the year 1923 he was himself indebted to Hamilton, who, according to his own record, was the principal with whom he was dealing, and on personal account. He claims that Hamilton was always after him for money, and claims also that as far as he knew all these 1923 loan that were consolidated by the note obliging Carr and the company went to the company's benefit. We do not think it so appears. The proceeds of these notes were deposited to the individual credit of Hamilton. If Hamilton was hard up for money, and was buying coal and selling it to Scott on credit, as appears from this account, a reason is afforded for the execution of the demand notes, and that they should be secured by Scott, as it would accommodate both, enabling Hamilton to pay for the coal he purchased and delivered to Scott, and accommodate Scott until he could repay it with any profits that Hamilton might make in the transactions.

Mr. Harvey testified that these consolidated notes were as follows:

"$74 Sept. 6, 1922,

"$350 Feb. 5, 1923,

"$650 Mar. 7, 1923,

"$1000 June 19, 1923,

"$600 Aug. 22, 1923."

It appears from the proof that all these were demand notes except the last one of $600, which was a time note.

Looking to the account filed by Mr. Scott it appears that when the $760 note of September 6, 1922 was executed he owed Hamilton & Carr Coal Company a balance of $277.81, which balance was increased on September 20 by the purchase of three more cars at the price of $529, and on October 2 by the purchase of two cars at the price of $459. Eliminating the four cars purchased of Hamilton & Carr Coal Company on October 26, 1922, at the price of $641.70 for which the check of November 20, 1922 in the exact amount was evidently intended to apply, it would appear that on October 30 and November 3, when the two payments aggregating $1359.94 were made, Scott owed Hamilton & Carr Coal Company, and Hamilton individually, $371.94. Applying these payments in proportion it would leave him on December 1, owing the partnership $214.71, and Hamilton $63.09.

The borrowing of the money would therefore appear to have been occasioned in part by the failure of Scott to pay cash on delivery, but aside from the $214.71 balance and the car sold him in January, 1923, by the partnership, amounting to $152.50, we do not see how it could be claimed that the partnership received, or was occasioned to receive any other benefit; as beginning with December, 1922, and with the exception of the single car sold him in January, 1923, his dealings were wholly with the defendant Hamilton in the purchase

of cars from him as a broker; and during December and January, and including the car purchased on the 4th of September, 1923, he purchased fourteen cars of coal from Hamilton, and this exhibit shows he knew he was dealing with Hamilton as an individual and not with the company.

There is no escape, we think, from the conclusion, that when he learned Hamilton had not settled these notes (with the exception of one) which were all dated in 1923, with the checks that had been given him, he thought that an offense had been committed, and that he presented him a serious alternative to fix them. It is not far to infer that Hamilton's only way out was a belated application to Carr, and upon a false premise, which was to represent to Carr that these small notes had been made for money borrowed by the company to transact its work; and, having confidence in Hamilton that this was a true representation of the facts, Carr signed the consolidated note. Upon his becoming suspicious renewal was secured by false representations of both Scott and Hamilton that the money was for the use and benefit of the company.

We think it appears that the company could not have been benefited beyond the two items aggregating $367.21 by these notes, and we think they were executed under the necessities arising from this purchase of coal from Hamilton as a broker; that if Scott was deceived by Hamilton it was with reference to his personal affairs, and that the benefit of these loans went to Hamilton alone. We think Mr. Scott, knowing that the greater portion of not all of these transactions in which these smaller notes were executed were transactions involving only the individual liability of Hamilton, elected to secure Hamilton's individual paper, and later when he discovered that Hamilton had not paid his individual obligations, he fraudulently connived at and assisted Hamilton in the attempt to shift his own responsibility upon the shoulders of Carr, and that the case of Foster v. Hall, 4 Hump. 341 cited by the Chancellor, among others, is applicable to this case.

In the case just referred to Hall alone had executed the note, but it was claimed that it was for the benefit and at the request of the firm. In that case the court said:

"In the case of Emerson and Crouch v. Bowman, 3 Hump. 209, this court held that where a note is executed in the name of one member of a firm as a general rule the other members of the firm will not be bound thereby; that, to bind all, it must be executed in the firm name, unless it be shown that credit was given to the firm, and that the money went into its business. The principles announced in that case are supported by the authorities. Judge Story (Com. Part. sec. 102), speaking of the power of a partner to bind his co-partners, says: 'All such con-

tracts and engagements, acts and things, he has authority to make and do in the name of the firm, and, indeed, in order to bind the firm, they must ordinarily be done and made in the name of the firm, otherwise they will bind the individual partner only who executed them as his own private acts, contracts, or other things.' Again, (sec. 140) he says: 'If a person should advance money for a firm, and yet take the security of one partner therefor, the security would bind the partner only; and, indeed, if the separate security is knowingly taken upon advances for the firm, it will ordinarily be treated as an election by the security to absolve the partnership from responsibility, and to confine the credit to the partner only; nor will it make any difference in such a case that the money has not only been borrowed, but has been applied to partnership purposes. On the other hand, if money is actually borrowed on the credit of the firm, in the course of the business of the firm, it will make no difference in the liability of the other partners that it has been misapplied by the borrowing partner.' ''

In Collier on Partnership (chap. 2, sec. 2, p. 262), it is said:

''If a person advances money even for the purposes of a firm, but takes the separate security of one partner, the partnership not being carried on in that partner's individual name, the contract as evidenced by such individual security is several, and a several action only can be brought upon it.''

Again, at the same page, it is said:

''If a person advance money to the firm, and take the separate bill of one partner, he cannot sue the firm on that security, although he may possibly succeed in an action against the firm for money advanced on the bill; the contract is several, and the individual partner alone can be sued.''

The court then said:

''In relation, therefore, to the notes upon which Eaton's name does not appear, he cannot be held directly responsible. But as the complainant has paid these notes to the creditors who advanced the money, having been liable therefor as endorser, he insists that he thereupon became a creditor of the firm for money advanced. The question then arises, was this money advanced for the firm and upon its credit?''

It was held that Eaton, though a member of the firm, could not be held liable in that case.

Under these facts we do not think any question of estoppel can be set up in favor of Mr. Scott. The assignments are therefore overruled and the decree of the Chancellor affirmed, with costs of this court against appellant. The costs below will remain as adjudged by the Chancellor.

Portrum and Thompson, JJ., concur.